AO 106A  (8/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**SEALED**

# UNITED STATES DISTRICT COURT
for the
Southern District of California

**FILED**

Jun 04 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY     s/ ClaudiaCarranza     DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Katelyn (Singh) McLaughlin, 2021 Anderholt Rd, Holtville, CA 92250 | ) ) ) ) |

Case No.  **2:24-mj-08488-LR**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-1 and B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) *(check one or more):*

☑ evidence of crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841, 846; 18 USC §§ 1956-1957 | Distribution of Controlled Substances; Conspiracy to Commit Same; Money Laundering |

The application is based on these facts:

See Attached Affidavit of Special Agent Richard Lopez, HSI, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet

*Richard F. Lopez*
_____
*Applicant's signature*

Special Agent Richard Lopez, HSI
_____
*Printed name and Title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:  __June 4, 2024__

_____
*Judge's signature*

City and state:   El Centro, CA

Hon. Lupe Rodriguez, Jr., U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Richard Lopez, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for the following location:

- **2021 Anderholt Rd, Holtville, CA 92250** ("Target Location"), as further described in Attachment A;

and to search for the following person to be arrested:

- **Katelyn SINGH (now married as Katelyn McLaughlin)**[1] ("Target Fugitive"), as further described in Attachment B-1;

and to search for and seize the following:

- evidence of crime; contraband, fruits of crime, or other items illegally possessed; relating to violations of 21 U.S.C. §§ 841, 846 (distribution of controlled substances and conspiracy) and 18 U.S.C. §§ 1956-1957 (money laundering), as further described in Attachment B-2.

2.     The premises to be searched at the Target Location will include the residence and all rooms, immediately surrounding grounds, sheds, shacks, garages, and trailers located at **2021 Anderholt Rd, Holtville, CA 92250** and will also include storage areas, safes, briefcases, containers, trash receptacles within the location to be searched and the surrounding grounds and outbuildings at the Target Location.  The search will also encompass any vehicles that may be located on the premises.

3.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by agents on this investigation or by other

---

[1] The Target Fugitive was charged as Katelyn SINGH.  I understand she has married and now uses the name Katelyn McLaughlin.  To avoid confusion, I use SINGH.

federal, state, and local law enforcement with whom I have spoken, whom were involved in this investigation, or whose reports I have read and reviewed.

4.     Because this affidavit is being submitted for the limited purpose of seeking search warrant specified below, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

## INTRODUCTION AND EXPERTISE

5.     I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since November 2018. I am currently assigned to the Assistant Special Agent in Charge ("ASAC") Calexico, California Office, Imperial Valley Border Enforcement Security Task Force ("IV-BEST").   I am cross-designated with the Drug Enforcement Administration ("DEA") and have the authority to conduct Title 21 investigations and enforcement activities.  I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between DEA and ICE.

6.     I have had formal and on-the-job training in controlled substance investigations, and I am familiar with the manner in which controlled substances, including cocaine, are imported, often into the United States from Mexico, packaged, marketed, sold, and consumed. Before HSI, I was employed as a police officer with the El Centro Police Department in El Centro, California between 2008 and 2018. Between April 2014 and October 2014, I was a Task Force Officer ("TFO") for IV-BEST, during which I participated in Title-III wiretap investigations involving the importation and

distribution of controlled substances. I attended a six-month full-time Police Academy at the Ben Clark Public Safety Training Center in Riverside, California and graduated in April 2009.  During the academy, I completed 12 hours of training specialized in crimes involving criminal substances.  During my career, I have received specialized training in the subject of narcotics investigations from federal and state law enforcement agencies such as the DEA and HSI. For example, I have completed an academy class at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA, which I graduated in June 2019. I have also received on-the-job training from my supervisors and colleagues.  I have also had numerous discussions with senior law enforcement officers and agents, within my agency and others concerning controlled substances crimes and criminal activity. Through these conversations, I have been able to familiarize myself with the terminology used by drug-trafficking organizations (DTOs) specializing in cross-border Mexico-to-U.S. smuggling methods.

7.     During my employment, I have investigated and participated in the investigation of illicit controlled substance trafficking occurring in the United States and Mexico. I have participated in multiple investigations for controlled substance violations. During narcotics investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, undercover and confidential source buy operations, pen trap and trace devices, Title-III wiretaps, search warrants, and the analysis of telephone records. Further, I have participated in investigations in which drug traffickers relied heavily upon telephone communication and other electronic devices as a means of communicating. Finally, I have been trained in interviewing individuals who have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs and controlled substances.

8.     Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by

narcotics organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities. During the course of

my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances.  I am also familiar with the manners and techniques of traffickers in cocaine, methamphetamine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

9.     The following is based on my own investigation and investigations conducted by other law enforcement agents, including oral and written reports by other law enforcement officers, physical and electronic surveillance, interviews, subpoenaed and public records, database checks, searches, phone analysis, and other investigation and information. Since this Affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested order. Conversations and discussions are set forth below in substance unless otherwise noted. The quotes and summaries of intercepted conversations initially intercepted in Spanish have been translated into English. Unless otherwise noted, the intercepted exchanges in the Probable Cause and Toll Analysis sections of this Affidavit are a verbatim translation of the exchange.  Annotations are provided in parenthesis.  My interpretations of certain statements are set forth following those statements and are based upon my knowledge of this investigation and my training and experience. Dates and times are approximate. The text of interceptions represents monitors' and agents' summaries, understandings and interpretations at the time of interception, and are subject to review and revision.

## STATUTES AT ISSUE

10.    The Target Offenses are the following: 21 U.S.C. §§ 841, 846 (distribution of controlled substances and conspiracy to distribute controlled substances); and 18 U.S.C. §§ 1956-1957 (money laundering).

11.    Money laundering covers a broad array of criminal conduct, including where a defendant (1) conducts or attempts to conduct a financial transaction involving property that represents the proceeds of specified unlawful activity (*e.g.,*

wire fraud); (2) knew the property represented the proceeds of some specified unlawful activity; and (3) defendant either (i) knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds; or (ii) acted with the intent to promote the carrying on of the specified unlawful activity. *See* 18 U.S.C. §§ 1956.  Conspiracies to commit money laundering are covered under 18 U.S.C. § 1956(h).  Money laundering also covers instances when a defendant (1) knowingly engages or attempts to engage in a monetary transaction; (2) knew the transaction involved criminally derived property; (3) the property had value greater than $10,000; and (4) the property was in fact derived from some specified unlawful activity (such as wire fraud); and (5) the transaction occurred in the United States. *See* 18 U.S.C. § 1957.

<u>FACTS SUPPORTING PROBABLE CAUSE</u>

**A.    Investigation Overview**

12.    Since December 2019, HSI has been investigating the drug trafficking and money laundering activities of an organization based in Mexicali, Mexico and the Imperial Valley, California.  The investigation led to numerous seizures of methamphetamine and other drugs, including the bulk drugs shown here.



13. Through the investigation, agents identified the MENDOZA DTO, which is led by brothers Eduardo MENDOZA, aka "Casper," and Francisco MENDOZA, aka "Pancho" ("F. PANCHO"), who are Imperial County based poly-drug distributors responsible for facilitating the smuggling and distribution of multi-kilograms quantities of methamphetamine and fentanyl from Mexicali, Baja California to various cities in the United States, including in the Imperial County.

14. The investigation identified that the MENDOZA DTO is supplied by a Sinaloa Cartel linked source of fentanyl supply in Mexicali, Mexico. As part of this investigation, in June 2021, agents identified that targets of this investigation were obtaining fentanyl pills in Imperial Valley at approximately $1.65 to $1.75 per pill. By December 2021, the prices being discussed had dropped to approximately $1.25 per pill. In May 2024, the price of fentanyl had dropped precipitously, with the per-pill price for fentanyl pills dropping to approximately 45 cents. I believe this reflects increased supply of fentanyl pills and the close ties between the targets of this investigation and their Sinaloa Cartel supplier of fentanyl pills.

15. For example, on June 21, 2021, agents intercepted a phone call conversation between E. MENDOZA and a Mexico-based associate. During the call, E. MENDOZA made references to "Ruso's people" and later in the conversation discussed the per-pill price of fentanyl. At that time, E. MENDOZA and his associate mentioned that the price for fentanyl pills in the Imperial Valley was around $1.65 to $1.75 per pill. Based on my training and experience and knowledge of this investigation, I believe "Ruso" is a reference to Jesus Alexandro Sanchez Felix, aka "El Ruso," who is believed to be the leader of an armed wing of the Sinaloa Cartel. On or about April 1, 2024, the FBI named Sanchez Felix to its wanted list.

16. As part of the investigation into the MENDOZA DTO, agents conducted multiple rounds of wiretap intercepts resulting in multiple seizures of methamphetamine and fentanyl in the Imperial County. Additionally, during the

investigation of the MENDOZA DTO, agents identified SINGH as an Imperial County based drug distributor who is a member of the MENODZA DTO.

**B.     Investigation of SINGH**

17.     On March 25, 2021, the Honorable Todd W. Robinson, United States District Judge, authorized the interception telephone number 442-226-0222, believed to be used by Chris COFFMAN. Agents had identified COFFMAN as a stash-house operator and domestic drug distributor working for the MENDOZA DTO.

**C.     April 12, 2021 – Seizure of 872.8 Grams of Fentanyl and 963.3 Grams of Methamphetamine**

18.     On March 29, 2021, agents intercepted a phone call conversation between COFFMAN and E. MENDOZA. During the call, COFFMAN and E. MENDOZA began coordinating a drug smuggling event from Imperial County to New York by mail. The conversation began with COFFMAN and E. MENDOZA Discussing a prior shipment of methamphetamine to E. MENDOZA's brother, F. MENDOZA, aka "Pancho." The conversation between the parties continued with E. MENDOZA instructing COFFMAN to send out two pounds of methamphetamine to New York via mail.

19.     On March 30, 2021, E. MENDOZA once again called COFFMAN to discuss the drug shipment to New York. E. MENDOZA informed COFFMAN that the drugs would be coming in and E. MENDOZA wanted COFFMAN to make the shipment to New York look like an Easter basket. E. MENDOZA then let COFFMAN know that he would send "Katie," [Katelyn MCLAUGHLIN] to the store to buy materials to make the package look like an Easter basket.

20.     Based on the calls above, agents initiated surveillance on COFFMAN, which led agents to discover COFFMAN's associate, Katelyn SINGH. During surveillance, agents continued intercepting conversations between COFFMAN and SINGH where they discussed the weight of the methamphetamine, drug related debt,

and future drug transactions. During surveillance, agents observed SINGH arrive at COFFMAN's location. COFFMAN and SINGH entered SINGH's vehicle and together they departed to COFFMAN's residence. After approximately an hour, SINGH exited COFFMAN's room and made her way to the Brawley Post Office. SINGH entered the post office and then minutes later exited the post office with what appeared to be a mailing label. While SINGH was preparing for the drug shipment, agents intercepted a series of phone calls between COFFMAN and E. MENDOZA. During these calls COFFMAN and E. MENDOZA discussed the shipment including details such as drug related debt and SINGH's payment. Continued surveillance of SINGH and COFFMAN revealed SINGH returning to COFFMAN's residence holding two bags she obtained from Walmart. After some time, SINGH exited the room holding a box and returned to her truck where she traveled to the Brawley Post Office. SINGH entered the post office with a box in hand and minutes later exited the post office without the box. Below is a photo of SINGH when she was entering the post office with the box.



21.    Agents advised the U.S. Postal Inspector, who was able to identify the package SINGH had dropped off through review of surveillance video. On April 12, 2021, DEA agents assigned to the New York Field Office searched and seized the package pursuant to a federal search warrant. Inside the package, agents discovered

approximately 872.8 grams of fentanyl pills concealed inside decorated Easter eggs, and two clear vacuum sealed bags containing approximately 963.3 grams (2.12 pounds) of methamphetamine.

 

### D.    August 19, 2021 – Seizure of 1.63 Kilograms of Methamphetamine

22.    Between August 10 and 18, 2021, through intercepts and physical surveillance, investigators learned that Eduardo MENDOZA and Francisco MENDOZA coordinated a methamphetamine transaction with Tyler Kyle CHRISTIANSEN, a resident of New Mexico, to pick up three to four pounds of methamphetamine from a narcotics courier/stash house operator, Tyran SULLIVAN in Brawley, CA.  Agents initiated surveillance at SULLIVAN's residence and were able to observe CHRISTIANSEN arrive in a green van at SULLIVAN's house. The surveillance continued for a considerable time as agents followed CHRISTIANSEN. Records checks revealed CHRISTIANSEN had an outstanding warrant for his arrest. On August 19, 2021, Terry CHRISTIANSEN was arrested at Gateway Park located in Yuma, AZ, when a search of the vehicle resulted in the discovery of 1.63 kilograms (3.58 pounds) of methamphetamine in CHRISTIANSEN's van.



**E.    February 14, 2024 – SINGH Arrested at Target Location with Methamphetamine**

23.    On February 14, 2024, the Imperial County Sheriff's Office along with Imperial County Probation Department conducted a compliance check for SINGH's husband, Scott Joseph McLaughlin, at the Target Location.

24.    Deputies approached the Target Location and knocked on the door. Shortly after, McLaughlin stepped out and a deputy advised him why deputies were there.  McLaughlin was detained and searched.  Deputies found a debit card on his person in the name Katelyn Singh.  A deputy asked who the debit card belonged to, and he said his wife who was sitting in front of the house in the front yard.  The deputy approached the female, Katelyn SINGH, who verbally identified herself as Katelyn Singh McLaughlin (SINGH) with her date of birth.  SINGH confirmed the card belonged to her.

25.    Deputies then asked McLaughlin what vehicle was his. He stated it was the red Ford F-150 parked on the driveway.  McLaughlin then changed his story and stated the vehicle belonged to his wife (SINGH).  While searching the Target Location, a probation officer located a black purse in the hallway.  The purse appeared to belong to SINGH.  It contained her wallet and a California identification card SINGH's name.  Inside the purse was a green camouflage cloth bag containing a methamphetamine pipe, which the deputies recognized as drug paraphernalia.  In

addition, they located two baggies containing a crystal-like substances, which later tested positive for the characteristics of methamphetamine.  The pipe also had a bulbous end with white residue inside, which is consistent with methamphetamine.

26.     SINGH was arrested.  Post-arrest, SINGH was advised of her *Miranda* rights.  SINGH stated she understood her rights and agreed to talk to the deputies. SINGH asked, "Is he going to jail, if it's his."  The deputy answered in the affirmative.  SINGH denied ownership of the methamphetamine.  When asked if the drugs and paraphernalia belonged to her, SINGH remained quiet.  The interview was then terminated by the deputies.

27.     Post-arrest, SINGH's husband, McLaughlin, was advised of his *Miranda* rights.  McLaughlin waived his rights and agreed to speak to the deputies. When asked about the methamphetamine and paraphernalia, he stated "I don't know nothing about it."   McLaughlin then changed his story and claimed the methamphetamine pipe and methamphetamine was his and did not belong to his wife.

28.     Based on my training and experience, I know that individuals involved in drug distribution will often claim ownership of controlled substances when encountered by law enforcement to shield a spouse or loved one from being arrested.

29.     On that same day, McLaughlin contacted SINGH while in custody at the Imperial County Jail. During recorded and monitored jail calls, SINGH explained to McLaughlin where she had the baggie [methamphetamine] in her purse and where she dropped the baggie. Between February 14, 2024 and February 25, 2024, there were approximately 108 contacts between the McLaughlin and SINGH. During a recorded jail call, McLaughlin questioned SINGH if she was still "working," and advised SINGH to "stay out of trouble."

30.     Based on training, experience, and knowledge of this investigation, I believe SINGH was in possession of methamphetamine on February 14, 2024. When SINGH stated she had the "baggie" in the purse, I believe SINGH was referring to

the small bag of methamphetamine discovered during the probation check at the Target Location. Based on my training and experience, I know that drug traffickers separate narcotics into smaller quantities for further distribution to customers. Further, I believe SINGH continues to be involved in drug distribution activities, which is why I believe SINGH's husband remains suspicious of her "working." Based on training and experience, I believe drug traffickers use coded language to hide the illicit nature of their conversations.   Based on the context of the conversation, I believe "working" was used as coded language for drug trafficking.

     **F.**    **Toll Record Analysis**

    31.    In May 2024, agents subpoenaed subscriber and toll records for SINGH's telephone numbers. Based on a review of toll records, between February 21, 2024 and February 24, 2024, SINGH had approximately 31 contacts with telephone number 760-879-3647, which is a phone number believed to be used by James Wade HANKS.  Further, on February 27, 2024, SINGH had approximately 11 contacts with HANKS. During the wiretap investigation, agents identified HANKS as a methamphetamine source of supply for SINGH and her associates. Indeed, on January 11, 2024, HANKS was indicted on three criminal counts including conspiracy to import methamphetamine in violation of 21 U.S.C. §§ 952, 960, and 963, importation of methamphetamine in violation of 21 U.S.C. § 952, 960, and aiding and abetting, 18 U.S.C. § 2, and money laundering conspiracy in violation of 18 U.S.C. § 1956(h). I believe these continued communications between SINGH and HANKS indicate that SINGH is continuing to receive narcotics from one of her domestic sources of supplies, for further distribution in the Imperial County. Therefore, I believe that SINGH's residence, the Target Location, will likely contain evidence such as records, and ledgers,  as well as electronic records containing phone

numbers, locations, and contacts used in furtherance of her drug trafficking.

### G.   SINGH is Federally Indicted

32.   On March 14, 2024, a federal grand jury charged SINGH in a one-count, 12-defendant indictment with conspiracy to distribute methamphetamine and fentanyl.  An arrest warrant issued for SINGH the same day.  The arrest warrant remains active, and SINGH has not made an initial appearance on the indictment.

### H.   February 2024 – MCLAUGHLIN Located at Target Location

33.   As discussed above, on February 14, 2024, agents observed SINGH at the Target Location. After SINGH was federally charged, agents conducted additional surveillance to confirm SINGH's residence. On multiple occasions, agents have observed SINGH at the Target Location. For example, on April 11, 2024, agents observed SINGH at the Target Location entering a red Ford F-150 parked outside the Target Location, which was the same vehicle that was at the Target Location during the probation check discussed above. Based on open-source research, agents located an Instagram profile believe to be associated with SINGH. The name on the profile is Katelyn McLaughlin. The vanity name associated with the account is kate.j.spade. In addition, there are numerous profile photos, including one on May 19, 2024, matching the known likeness of SINGH. On March 11, 2023, the user of the Instagram account posted: "Sooo love my truck just sayin :)" and posted two photos of a red Ford F-150 matching the vehicle agents observed SINGH entering.

### I.   Financial Analysis

34.   Although 12 members of the MENDOZA DTO were charged in a drug trafficking conspiracy, I believe the members of the MENDOZA DTO, including SINGH, are also involved in money laundering.  Specifically, I believe members of the MENDOZA DTO send payments to one another using peer-to-peer money transfers, many of which I believe are to promote the drug trafficking activity and to compensate members for their contributions in furtherance of the conspiracy.

35.     For example, during the investigation, agents identified a CashApp account used by E. MENDOZA.  Based on a review of records from that account, agents identified that between October 13, 2021 and February 11, 2022, E. MENDOZA had approximately 22 transactions with Katelyn SINGH.  I know that users of CashApp associate their CashApp accounts to a bank account in order to transfer money out of their accounts.  Information related to SINGH's financial accounts, including any linked to her CashApp or other digital peer-to-peer payment systems is therefore evidence of crime because it links SINGH to other members of the conspiracy and demonstrates the financial linkage between SINGH and members of the MENDOZA DTO.

36.     Agents also subpoenaed records from Zelle, which is a peer-to-peer digital payment system operated by major banks.  Based on a review of subpoenaed records, E. MENDOZA would also send outgoing Zelle transfers to Katelyn SINGH. For example, between February 3, 2022 and February 16, 2022, E. MENDOZA sent approximately 6 outgoing transfers to SINGH.  The transfers ranged from $50 to $975.  The Zelle records also indicate that SINGH has a Zelle account associated with her Wells Fargo bank account.

37.     Based on a review of Wells Fargo records related to E. MENDOZA's Wells Fargo account that is associated with his Zelle account, I located additional transfers to SINGH from E. MENDOZA.  Between February 11, 2022 and March 31, 2022, E. MENDOZA sent approximately 26 outgoing transfers to Katelyn SINGH totaling $9,430.  The average transfer was approximately $362.

## ADDITIONAL BASES FOR EVIDENCE
## SOUGHT IN SEARCH WARRANT

38.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a.      Individuals involved in drug distribution often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b.      Individuals involved in drug distribution often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drug sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.   Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c.      Individuals involved in drug distribution must often rely on others to obtain their drugs and to help them market the drugs.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

d.      Individuals involved in drug distribution commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of these and other types of transactions are often found at the residences of individuals involved in drug distribution.

e.     Individuals involved in drug distribution often keep and maintain large amounts of United States currency at their residences.  Such funds are often used for everyday expenditures and to maintain and finance their ongoing drug business.  Additionally, individuals involved in drug distribution often amass and maintain assets at their residence which were generated by their distribution activities or purchased with the cash earned from such distribution.

f.     Individuals involved in drug distribution often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms.  Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their drug and firearms dealings.

g.     Residences and premises used by individuals involved in drug distribution usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

h.     Drug traffickers commonly use cellphones, tablets, or other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug distribution activities.  Drug traffickers also commonly store records of the business of distributing and selling drugs, on computers and computer discs, diskettes, cassettes, tapes, and other forms of digital media.  Drug traffickers commonly maintain these items on their person and/or in their residences and vehicles.  In fact, given this investigation stems from a long-term wiretap investigation and other facts

set forth in this affidavit, I know the Target Fugitive uses cellphone(s) to communicate with his co-conspirators, associated, and/or customers.

i.  Individuals involved in drug distribution often utilize radio scanners, police radios and other electronic equipment to conduct counter surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j.  Individuals involved in drug distribution often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug distribution activities.  Such items are typically maintained in their residences.  Drug traffickers often store information relating to their drug distribution business on their cellular telephones, computers and/or computer disks.

k.  In addition to their use of computers, persons involved in narcotics distribution, often use digital media, including USB flash drives, in furtherance of their criminal activities.  Flash drives offer suspects the ability to store an extremely large volume of data in a very compact, portable, and easily concealable device.  Flash drives facilitate the criminal activities of suspects by allowing them to access their data from more than one computer, transfer data to others, show data to others without permanently transferring it, and physically conceal media and its associated data from law enforcement.

l.  In addition to their use of computers and digital media, persons involved in narcotics distribution, often use mobile phones in furtherance of these activities.  When used in this manner, the mobile phones typically contain data constituting evidence of these activities.  Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers.  They are commonly used in furtherance of illicit activity in the same manner as computers, as detailed above.

m.     In addition to functioning as computers, mobile phones have a more basic function as mobile communication devices, and are an indispensable tool for persons involved in narcotics distribution  Specifically, during the course of this investigation and other investigations, I have learned that suspects use mobile phones, in part to increase their mobility and to provide them with instant access to phone calls, text messages, emails, and voice messages; and in part, because they believe it is more difficult for law enforcement to identify the subscribers and users of mobile phones, as compared to landline telephones.  It has been my experience that when individuals are detained or arrested, calls between those individuals and their co-conspirators are often present in the contact lists and the recent calls of the phones in their possession.

n.     As described earlier in this affidavit, promotion money laundering involves a financial transaction using the proceeds of specified unlawful activity (*e.g.*, drug trafficking) to promote the underlying specified unlawful activity.  A classic example is the use of proceeds from drug sales to pay for the rent for a lodging used to stash and/or distribute drugs. I believe there is probable cause to believe SINGH uses the Target Location to stash drugs and to coordinate drug trafficking activities. Financial transaction intended to promote the underlying specified unlawful activity, e.g., drug trafficking, would likely constitute promotion money laundering events.  I therefore believe evidence of money laundering is likely at the Target Location, including receipts, tax and property records for the Target Location and other expenditures related to SINGH's drug trafficking activities.

39.     It is also my opinion and belief that the above-described documents are currently possessed by drug dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date.  These documents are kept by drug dealers whether or not the dealer is in possession of any drugs or

19

chemicals at any given moment.  I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

40.    The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing.  Due to the quantities of drugs being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale and distribution of drugs for a while.  Based on my training and experience, I believe that the criminal activity described above is, by its nature, self-perpetuating.  As a consequence, I believe that the items described in Attachment B-2 will provide evidence of the events set forth in this affidavit and that such articles can be found at the Target Location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

## **REQUEST FOR SEALING**

41.    Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee, and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further order of the Court.

## **CONCLUSION**

42.    Based on my experience and training, consultation with other law enforcement officers experience in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I believe the person to be arrested set forth in Attachment B-1, will be found at the Target Location, as more fully described in Attachment A.  Based on the foregoing, I also believe that evidence, evidence of crime; contraband, fruits of crime, or other items illegally possessed; relating to violations of 21 U.S.C. §§ 841, 846 (distribution of controlled substances and

conspiracy) and 18 U.S.C. §§ 1956-1957 (money laundering), as further described in Attachment B-2, are reasonably likely to be found at the Target Location.

*Richard F. Lopez*
_____

Richard Lopez, Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on June 4, 2024.

**4:52 p.m.**
_____

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

21

**ATTACHMENT A**

(Premises to be Searched)

The property to be searched is **2021 Anderholt Rd, Holtville, CA 92250** (Target Location).

**Description of Target Location.** The Target Location is located on the west side of Anderholt Road and is the tenth residence south of East Evan Hewes Drive intersection. The Target Location is a single-family home, which is tan in color made of stucco, has red tile roofing and faces east. The Target Location has a tan brick wall approximately three feet in height enclosing the east facing side (front entrance) of the property with metal gate entryway south of the garage door. This target location has two windows, two dark brown doors "French Doors" (main entrance), and a white garage door. The Target Location has the numbers "2021" affixed in a horizontal position south of the garage door facing east. The Target Location has an American flag affixed to the residence just above the right side of the garage, a vehicle covered with a gray tarp in the driveway, and a white toy hauler parked curbside in front of the residence. The Target Location has one tall palm tree in the front lawn and several in the back yard.



**ATTACHMENT A**
(Continued)

Overhead view:



Google Street View



## **ATTACHMENT A**

(Continued)

Overhead view:



* * *

## ATTACHMENT B-1
(Person to be Arrested)

| | |
|---|---|
| **Name:** | **Katelyn SINGH**<br>**(now married as Katelyn Singh McLaughlin)** |
| **DOB:** | ▮▮▮▮▮▮ |
| **Hair:** | Brown |
| **Eyes:** | Green |
| **Race:** | White |
| **Height*:** | 5'04 |
| **Weight*:** | 145 lb          *approximates |

 

4

# ATTACHMENT B-2
### (Items to be Seized)

1.     Any federally controlled substances ("drugs"), including methamphetamine, fentanyl, cocaine, heroin and marijuana, and any drug paraphernalia.

2.     Photographs of drugs or persons in possession of drugs;

3.     Any firearms, including revolvers, pistols, rifles, shotguns, machineguns, silencers, destructive devices; including magazine and ammunition and items related to firearms possession.

4.     Any documents, including receipts, telephone records, telephone bills, address books, distribution lists, customer lists, drug supplier lists, price lists, lists of drugs acquired and disposed of, bank statements, storage unit receipts, wire transfer receipts, drug money ledgers, pay-owe sheets, correspondences, documents or devices noting price and other records that relate to the sale, purchase, transfer or possession of any drugs;

5.     Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, computer disks, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates engaged in the unlawful possession, acquisition, sale or distribution of drugs;

6.     Records, items, and documents reflecting travel for participating in a drug trafficking conspiracy, including airline tickets, passports, credit card receipts, travel vouchers, hotel and restaurant receipts, rental vehicle receipts, canceled checks, maps and written directions to locations;

7.     Indicia of occupancy, residency, control and/or ownership of the Target Location and related vehicles, such as utility bills, telephone bills, loan payment receipts, rent documents (or hotel receipts), envelopes and keys, photographs, bank records, and rental bills;

8.     Money, assets, and evidence of assets derived from or used in the sale of drugs and records thereof, including United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashier's checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

9. Any digital devices (**seizure only**) associated with the individual in Attachment B-1 (█████████████████████████), including any cellphone associated with the phone number 760-556-5691.

"Digital devices" means cellphones, computers, computer tablets (e.g., iPads), and electronic storage devices (e.g., hard drives, thumb drives).

**which constitute evidence of crime; contraband, fruits of crime, or other items illegally possessed; relating to violations of 21 U.S.C. §§ 841, 846 (distribution of controlled substances and conspiracy) and 18 U.S.C. §§ 1956-1957 (money laundering) (Target Offenses).**